633 A.2d 536

TIMOTHY FOXWORTH, PLAINTIFF–APPELLANT, v. SHELLY MORRIS, BOOKER T. KING, JR., KENNETH D. MERIN, COMMISSIONER OF INSURANCE FOR THE STATE OF NEW JERSEY, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS, AND UNSATISFIED CLAIM AND JUDGMENT FUND BOARD, DEFENDANT–RESPONDENT.

Argued September 13, 1993—Decided December 13, 1993.

*Dianne L. Ingemi* argued the cause for appellant (*Sal B. Daidone*, attorney).

*Kevin R. Dochney* argued the cause for respondent (*Slimm, Dash & Goldberg*, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns an injured person's eligibility to receive benefits from the Unsatisfied Claim and Judgment Fund (Fund). The Fund serves as a safety net for motor-vehicle-accident victims who sustain losses or injuries caused by uninsured or unidentifiable owners or operators of motor vehicles. For an innocent passenger in a car struck by an uninsured driver the Fund will cover up to $15,000 of uninsured losses occasioned by personal injury and up to $5,000 of uninsured losses resulting from property damage. *N.J.S.A.* 39:6–73(c)(1) and (3). The Fund also affords personal-injury-protection (PIP) benefits to cover medical claims up to $250,000 and loss of income up to $5,200. *N.J.S.A.* 39:6–86.1a and –86.1b. In addition to other requirements, to be eligible to collect benefits from the Fund, the injured person must show that "[h]e was not at the time of the accident, the owner or registrant of an uninsured motor vehicle * * *." *N.J.S.A.* 39:6–70(d). Posed most broadly, the question in this case is whether mere ownership of an uninsured car that is inoperable and unregistered precludes recovery from the Fund.

I

Timothy Foxworth was injured on May 4, 1987. He was a passenger in a vehicle owned and operated by Shelly Morris that

was struck by a vehicle owned and operated by Booker T. King. Both vehicles were uninsured.

On October 17, 1988, Foxworth filed a complaint in the Superior Court, Law Division, against King, Morris, and the Fund. He sought damages for bodily injury and PIP benefits. King and Morris defaulted. After a proof hearing, the court entered judgment against King in the amount of $14,959, which included $4559 for medical bills, $2400 for loss of wages, and $8000 for pain and suffering. On July 10, 1990, Foxworth applied for payment from the Fund. The Fund opposed payment contending that Foxworth was ineligible because he had been the owner of an uninsured car at the time of the accident.

Foxworth did own an uninsured vehicle. In February 1987, he had bought an inoperable 1976 Saab from a used-car lot and had it towed to a place of storage. Not intending to operate the Saab until it was driveable, Foxworth had not insured it. Foxworth claimed he never drove or operated the vehicle because the vehicle had major electrical problems. The record is unclear whether Foxworth had ever registered the vehicle or obtained license plates. In November 1988, Foxworth removed the car from storage and sold it for junk.

In ruling on the motion for payment from the Fund, the court stated that "there was a motor vehicle registered in the name of [Foxworth]," that Foxworth "had [the car] towed from the place he bought it to [a place] for storage," and that Foxworth had "[n]o insurance at the time of the accident." The court noted that Foxworth intended to have the car repaired but never had the money to do so. Relying on language in *Caldwell v. Kline*, 232 *N.J.Super.* 406, 412, 557 *A.*2d 661 (App.Div.1989), that an owner who "has taken the vehicle off the road * * * with no intent of operating it" may be eligible for Fund benefits, the court granted Foxworth's motion.

The Appellate Division reversed. The court acknowledged that the car had never been driven, had been kept in storage, and had not been repaired because Foxworth could not afford to make the

repairs. The court found that the legislative history of the Act did not

> reveal that the legislature would tolerate the absence of insurance coverage for whatever period of time the car's owner decided not to have it repaired, or during a period of time when the owner decided he would devote his resources to other things, and have a repairable and otherwise operable motor vehicle remain unrepaired.

In effect, the court held that to maintain Fund eligibility an owner would have to insure an inoperable and unregistered car. (The record contains no proof that this car was ever registered.) We granted certification, 133 *N.J.* 432, 627 *A.*2d 1138 (1993).

## II

■ Prior to 1983, the Fund law had disqualified only one who was "*operating or riding* in an uninsured motor vehicle owned by him * * *." *N.J.S.A.* 39:6–70(d) (emphasis added); *see Manzo v. Eddinfeld*, 126 *N.J.Super.* 20, 21–23, 312 *A.*2d 659 (App.Div.1973). In 1983, the Legislature amended the statute to disqualify also the "*owner or registrant* of an uninsured motor vehicle." *L.* 1983, *c.* 362, § 2; *N.J.S.A.* 39:6–70(d) (emphasis added). The plain language of the amendment expanded disqualification from operation only to include ownership of the uninsured vehicle. The question is whether, in every circumstance, an owner or registrant of an uninsured vehicle is precluded from Fund benefits.

At first glance, the present language of the statute would appear to create an absolute bar to recovery. We are uncertain, however, that the Legislature intended that. Consider, for example, the case of a person who has bought a used car, given the cash-purchase price to the seller, received the bill of sale, and returned home to arrange for insurance, registration, and license plates. At that point no one can drive the car until the owner has obtained plates, which the owner cannot do without proof of insurance. That person is, however, the owner of an uninsured motor vehicle. If that person were involved in an accident with an uninsured motorist, a literal reading of the Act would prohibit Fund benefits. We do not believe that the Legislature would

intend that a perfectly well-intentioned motorist, who has followed the letter of the law, should be deemed ineligible for Fund benefits merely because of the status of ownership. Our task is to have the law make sense: "it is a venerable principle that a law will not be interpreted to produce absurd results." *K Mart Corp. v. Cartier, Inc.,* 486 *U.S.* 281, 324 n. 2, 108 *S.Ct.* 1811, 1816 n. 2, 100 *L.Ed.*2d 313, 345 n. 2 (1988) (Scalia, J., concurring in part and dissenting in part). We " 'effectuate the legislative intent [of the law] in light of the language used and the objects sought to be achieved.' " *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992) (quoting *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980) (footnote omitted)). If, then, some conceptual window is found between the status of ownership and the status of disqualifying noncompliance with the requirements of law, our task is to decide how the Legislature would define that window.

### III

*Caldwell, supra,* traced the history of the Fund amendment. [P]rior to the amendment in 1983 if an uninsured motor vehicle owned by a claimant was parked, garaged, damaged or otherwise not in use and not involved in the accident, Fund payments would be available to the owner, even though the required insurance had not been purchased.

The 1983 amendment, however, removed the focus of operation/use and broadened the disqualification to all owners of uninsured motor vehicle. Thus, while prior thereto it could be found the intent was not to disqualify an owner whose uninsured vehicle was garaged or otherwise not operational, the contrary can be said was intended by the amendment.

[232 *N.J.Super.* at 411, 557 *A.*2d 661.]

The *Caldwell* court, however, concluded:

We do not mean to suggest an owner of a motor vehicle who has taken the vehicle off the road, for whatever reason, but with no intent of operating it, who has for instance removed the plates and registration, disconnected the batteries and the like, or has junked or abandoned the vehicle and, as a result, caused the insurance to lapse, would be disqualified. Construction of the statute that would compel, through disqualification, maintenance of automobile insurance under these circumstances would extend its scope beyond that intended by the Legislature. An owner without an intent to operate his vehicle, whether it be because of temporary inoperability or otherwise, is not the type of person the Legislature wanted to

exclude. Without the intent to operate and without registration and license plates, the vehicle could be no danger to anyone. Moreover, when the absence of insurance is the result of a decision to remove the vehicle from operation, there can be no concern of injury by a financially irresponsible or uninsured motorist.

[*Id.* at 412, 557 *A.*2d 661.]

That the statute had to be construed in light of its purpose was obvious to the *Caldwell* court. The problem is defining the point at which "there can be no concern of injury by a financially irresponsible or uninsured motorist." *Ibid.*

The *Caldwell* court examined cases in New Jersey and elsewhere relating the condition of a car to the purposes of a disqualifying law. *Id.* at 412–13, 557 *A.*2d 661. Some cases are easy. Some pieces of machinery are so hopelessly beyond repair that they cannot even be called motor vehicles. *State v. DeMarco,* 157 *N.J.Super.* 341, 348, 384 *A.*2d 1113 (App.Div.1978), illustrates that when a vehicle is a shell and the owner has no intention to repair, the object is closer to a junked or abandoned vehicle and is not considered a "motor vehicle." On the other hand, *DeMarco* held that while a car is in the process of becoming operable, it is a "motor vehicle." *Ibid.; see also Civil Serv. Employees Ins. Co. v. Wilson,* 222 *Cal.App.*2d 519, 35 *Cal.Rptr.* 304 (1963) (considering car not a "motor vehicle" when it had no dashboard, seats, starter, or generator, and had torn tires, had never been licensed, and owner had no intention to repair or operate); *Williams v. Standard Accident Ins. Co.,* 158 *Cal.App.*2d 506, 322 *P.*2d 1026 (1958) (considering car a "motor vehicle" when purchased in disrepair and in process of being repaired); *Fortune Ins. Co. v. Oehme,* 453 *So.*2d 920 (Fla.Ct.App.1984) (allowing PIP benefits to plaintiff whose intention to abandon vehicle was evidenced by withdrawal from road and storage in backyard).

At the time of the accident for which Fund benefits were sought, the *Caldwell* plaintiff owned a 1974 Pontiac Grand Prix that was registered and had current license plates but did not have insurance. 232 *N.J.Super.* at 408, 557 *A.*2d 661. The plaintiff had regularly operated the car until about two months

before the accident when the car blew an engine rod. The plaintiff had the car towed to a garage for repairs. A mechanic made the repairs, and eventually plaintiff returned the car to the road. *Ibid.* Because the plaintiff could not afford to make the repairs, the car was not repaired sooner. The record did not disclose whether the plaintiff had let the insurance lapse while the car was awaiting repair or whether the coverage had been cancelled prior to the blown rod. *Ibid.*

On that record the *Caldwell* court found that although the repairs to the car had been more than minor, plaintiff's intent to fix and to continue operating it showed no indication of abandonment, storage, or the like. *Id.* at 413, 557 *A.*2d 661. The court also surmised that the lapse in insurance was unrelated to operability because, as the documents revealed, the insurance had been cancelled for several months before the blown engine rod. *Ibid.* Caldwell was properly disqualified for Fund payments. *Id.* at 414, 557 *A.*2d 661. His ownership of an uninsured vehicle posed a danger to the motoring public.

Foxworth's situation is both like and unlike that of Caldwell. As in *Caldwell,* the car needed more than minor repairs, and the owner intended to repair the vehicle and operate it. Both Foxworth and Caldwell were short of cash. However, unlike Caldwell, Foxworth claimed he never drove the vehicle, had stored the car from the time of purchase, and eventually junked it. The record does not resolve whether Foxworth registered the vehicle and obtained license plates. Because registering a car in New Jersey without certifying that insurance is in effect is not possible, any registration would have been fraudulent. *N.J.S.A.* 39:6B–1.

## IV

In sum, then, we agree with the language in *Caldwell, supra,* that when one has taken a vehicle off the road with no intention of operating the uninsured vehicle, disqualification under *N.J.S.A.* 39:6–70(d) would "extend its scope beyond that intended by the Legislature." 232 *N.J.Super.* at 412, 557 *A.*2d 661. "With-

out the intent to operate and without registration and license plates, the vehicle could be no danger to anyone." *Ibid.* In recognition, however, of the special status of the Fund as in the nature of a public trust, *Douglas v. Harris,* 35 *N.J.* 270, 279, 173 *A.*2d 1 (1961), the burden to establish such facts is on the party seeking the exception. Anecdotal evidence will not meet this burden. Although an intent to abandon a vehicle need not be shown, the owner of an inoperable and uninsured car must demonstrate that there was no intention to make the vehicle operable in the immediate future after acquisition or withdrawal from the road, and present competent proof that the basis for inoperability was substantial. For example, a vehicle that is inoperable because it has no battery would not meet that test. We have no impression of whether the "electrical wiring" problem in the Saab required major repairs or an hour of rewiring. This should be clarified in the remand proceedings. The Fund maintains that it was Foxworth's intention to operate this vehicle immediately after he got it, as evidenced by his registration of the vehicle, and that the vehicle needed only "minor repairs." It contends that "[t]he absence of insurance had nothing to do with the operability of the vehicle" and that Foxworth did not sell the vehicle until 1988. As noted, in this case the record does not resolve whether the vehicle had been registered and, if so, what representations were made to the Division of Motor Vehicles. Were any misconduct committed in that application, that misconduct could demonstrate that Foxworth's ownership of the vehicle did present a danger to the motoring public.

Accordingly, we reverse the judgment of the Appellate Division and remand to the Law Division. Plaintiff shall be required to show by competent evidence that substantial repairs were required in order to make the vehicle operable, that he did not intend to operate the vehicle in the period immediately following its acquisition or at any time before it was insured, and, finally, that his ownership of the vehicle presented no public concern for danger of injury by an uninsured motorist.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN–7.

*Opposed*—None.